**Pages 1 - 19**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

TAG BROWN, individually and on )
behalf of all others similarly )
situated,                       )
                                )
         Plaintiff,             )
                                )
  VS.                           )  **NO. C 19-05773 EMC**
                                )
QUANTCAST CORP.,                )
                                )
         Defendant.             )
                                )

San Francisco, California
Wednesday, December 4, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
    NICHOLS KASTER, LLP
    235 Montgomery Street, Suite 810
    San Francisco, California 94104
**BY:  DANIEL S. BROME**
    **MATTHEW C. HELLAND**
    **ATTORNEYS AT LAW**

For Defendant:
    GIBSON, DUNN & CRUTCHER LLP
    1050 Connecticut Avenue, NW
    Washington, D.C.  20036
**BY:  JASON C. SCHWARTZ**
    **ATTORNEY AT LAW**

Reported By:  Ana M. Dub, RDR, CRR, CCRR, CRG, CCG
              Official Reporter, CSR No. 7445

|   |   |   |
|---|---|---|
| 1 | **Wednesday - December 4, 2019** | **1:39 p.m.** |

<pre>
 2                    P R O C E E D I N G S
 3                          ---o0o---
 4          THE CLERK:  Calling Civil Action 19-5773, Brown versus
 5   Quantcast Corp.
 6       Counsel, please approach the podium and state your
 7   appearances for the record.
 8          MR. BROME:  Good afternoon, Your Honor.  Daniel Brome
 9   with Nichols Kaster for the plaintiffs.
10          THE COURT:  All right.  Thank you, Mr. Brome.
11          MR. BROME:  And this is Matthew Helland.
12          THE COURT:  All right.  Thank you.
13       Mr. Helland.
14          MR. SCHWARTZ:  Good afternoon, Your Honor.  Jason
15   Schwartz from Gibson Dunn on behalf of the defendant,
16   Quantcast.
17          THE COURT:  All right.  Good afternoon, Mr. Schwartz.
18       Defendant's motion to compel.  We've got several
19   agreements.  The primary one, I guess, to start with, is the
20   first offer letter received by Mr. Brown and Mr. Berg.
21       And just to look at the scope question, it seems to me
22   what's significant regarding scope is that it uses the words
23   "arising from or regarding the interpretation, performance,
24   enforcement or breach of this letter agreement."  So it's not
25   just arising out of the relationship, but it also encompasses
</pre>

1   things that arise under or from the performance of the
2   employment agreement.  And it seems like that connotates
3   something broader than what otherwise might be the case if the
4   words "performance of the employment agreement" weren't
5   covered.
6   So why doesn't that apply in the first instance here, at
7   least for a scope question with respect to the classification
8   issue?
9   **MR. BROME:** So it sounds, Your Honor, like you're
10  highlighting "performance of this letter agreement."
11  **THE COURT:** Of the employment agreement, yeah, this
12  letter agreement.
13  **MR. BROME:** Yeah.  Because the claims here are not
14  for any assertion that either party failed to perform under the
15  agreement.  In fact, it seems that Quantcast did perform under
16  the agreement.  They paid plaintiff and other employees as
17  exempt.  And they may raise a defense that that was proper, but
18  the claim is for unpaid overtime.  And what the claim in the
19  case is has been misconstrued by defendant as a claim for
20  misclassification.  That's not a claim.  The claim is that they
21  were statutorily required to pay overtime, and that claim does
22  not arise out of performance of the terms of the agreement.
23  **THE COURT:** Well, why doesn't it?  If the terms of the
24  agreement provide for this certain treatment and classification
25  and, in performing that, the defendant violates overtime laws,

1   it seems like it does arise out of the performance of a very
2   bad employment agreement.  Right?  An employment agreement that
3   seems to set up a law violation, in your view.
4           **MR. BROME:**  I guess the way that we read this offer
5   letter is that if the plaintiffs had claims that the defendant
6   had not performed under the terms of the offer, then that
7   reading would make a lot more sense; whereas this -- to suggest
8   that anything connected to the employment relationship is
9   brought in because of the word "performance of the letter
10  agreement," you know, that's different than employment offers
11  that say "anything connected to your employment," "anything
12  connected to the employment relationship."  By phrasing it all
13  of those, you know, "interpretation, performance, enforcement
14  or breach of this letter agreement," I think the scope is
15  narrower than --
16          **THE COURT:**  Wouldn't literally --
17          **MR. BROME:**  -- we often see.
18          **THE COURT:**  Wouldn't an overtime violation literally
19  arise out of the performance of the agreement?  If the
20  agreement says, "We're not paying overtime, no matter what,"
21  and then you perform -- they perform the agreement and it's a
22  bad agreement because it violates the law -- and their
23  performance, therefore, violates the law -- the failure to
24  provide overtime would be something arising out of the
25  performance of that agreement.

1    So here, the employment agreement sets up the
2 classification and the remuneration structure; right?
3    **MR. BROME:** It does. And I think that the employer
4 will say, "Well, we paid according to the terms of the
5 agreement." And therefore, part of their defense is that the
6 way that they paid was based on the agreement.
7    But the claim is not based on the agreement, and that's
8 why we think that it's not covered.
9    **THE COURT:** Well, and if it said "based on the
10 agreement," I could see that. But it does say "arise under" or
11 "arise from" or "regarding" -- "arising from or regarding."
12    **MR. BROME:** Right, which is narrower than "relating
13 to."
14    **THE COURT:** Maybe, but it seems like it still
15 literally applies. And if it comes close, we're supposed to
16 resolve doubts in favor of arbitration. Sort of, the tie goes
17 to arbitration under the existing precedent.
18    **MR. BROME:** Yeah. Well, to the extent that this
19 employment letter is read to include claims for statutorily
20 required but unpaid overtime, then that's where our other
21 arguments come in; that this agreement is intentioned with the
22 contemporaneous provisions of the commission sales plan and
23 that the rules provided for in this agreement impose improper
24 fees on employees and that this agreement is non-mutual.
25    So while --

1           **THE COURT:**  So, unconscionable --

2           **MR. BROME:**  Correct.

3           **THE COURT:**  -- for those reasons?

4      Let's talk about the mutuality question and the fee

5  question.  The mutuality arises from the fact that it's

6  one-sided -- "you agree," not "we agree" -- right?

7           **MR. BROME:**  Right.  It's a combination of the "you

8  agree" and the carve-out, that the agreement applies to all

9  disputes and controversies with the sole exception of those

10 disputes which may arise from your confidentiality agreement.

11      And the confidentiality agreement presents a couple of

12 problems.  First, it imposes obligations on the employees, but

13 not on the employer, as we read it.  And second, it provides a

14 right to injunctive relief for the employer, but not the

15 employee.

16      And so that "you agree" language is problematic because it

17 does not contain a promise from the employer to arbitrate.

18 Now, the employer asserts that they are implicitly agreeing to

19 be bound by this, but it's certainly not clear from the text

20 that -- "you agree" is different from "we agree."

21      And then, particularly in concert with the carve-out for

22 claims arising from the confidentiality agreement, which

23 imposes burdens on the workers and which offers a right to

24 injunctive relief that is excluded from this arbitration

25 policy, that is the type of non-mutual agreement that courts

1  have found to be substantively unconscionable.
2  **THE COURT:** All right. What's your response to the
3  non-mutuality?
4  **MR. SCHWARTZ:** Sure. Thank you, Your Honor.
5  Let me just take each piece of that.
6  First of all, with respect to the use of the first person,
7  to make it an employee-friendly document, we cited in our brief
8  the *Roman* case, which is three years subsequent to the *Higgins*
9  case that the plaintiff relies on, that finds that this
10 language does, in fact, reflect mutuality.
11 And indeed, the plaintiff's second argument wouldn't make
12 any sense if this wasn't mutual. They're arguing that the
13 carve-out for the confidentiality agreement only benefits the
14 employer. If the employer isn't subject to this arbitration
15 agreement, then that argument makes no sense. Right?
16 So the *Roman* case tells us -- and the *Serafin* case as
17 well, which refers to language "any and all disputes," which
18 similar language also appears in the first offer letter -- that
19 it is, in fact, mutual.
20 With respect to the carve-outs, so the carve-out for the
21 confidentiality agreement, the argument there, as I understand
22 it from the plaintiff, is that the obligations under that
23 agreement are only obligations on the plaintiff, and therefore,
24 only the company could have such claims.
25 First of all, that's not true. Paragraph 4 of the

confidentiality agreement contains intellectual property rights of the plaintiff consistent with California law. For example, if I'm an employee of Quantcast and I invent something in my garage and it does not relate to Quantcast business, paragraph 4 reaffirms that I own that.

The subsequent paragraph, about each party agreeing to take whatever additional measures are required to confirm the ownership, imposes obligations on both parties. So, for example, if there's a dispute about my invention in the garage, I, as the employee, might have an affirmative claim under that agreement. I also might have an affirmative claim under that agreement if I'm seeking declaratory judgment in response to one of my rights -- of the company's rights, rather.

But this provision specifically creates affirmative rights that I can enforce; so it is mutual.

**THE COURT:** Although it is highly likely -- right? -- that the party most likely to utilize those is the employer, not the employee.

**MR. SCHWARTZ:** I agree with that, Your Honor, absolutely.

And then the similar provision in the second employment letter, which the plaintiffs also focus on for this same argument, actually is not limited to the confidentiality agreement. It refers to, among other things, privacy rights. And, of course, a California employee has numerous privacy

1   rights that they might assert against an employer.  That one, I
2   would argue, actually is, you know, at least equally likely to
3   be utilized by an employee.
4       Finally, I'd note, Your Honor, that in at least two recent
5   cases, this Court has excised a provision like that.  So to the
6   extent that Your Honor finds that it is --
7           **THE COURT:**  Severable.
8           **MR. SCHWARTZ:**  Absolutely.
9       -- then it can be severed.
10      So that's not an obstacle to enforceability, Judge.
11          **THE COURT:**  Okay.  Let me ask about the fees and
12  costs --
13          **MR. SCHWARTZ:**  Yes.
14          **THE COURT:**  -- question.
15          **MR. BROME:**  May I interject briefly, Your Honor,
16  before we turn to the fees and costs?
17          **THE COURT:**  Okay.
18          **MR. BROME:**  On those two cases, the guaranteed rate
19  cases, this Court found that a very similar provision was
20  substantively unconscionable and severed it based on a
21  provision contained in the arbitration agreement that offered
22  the option to sever any unenforceable terms, which is not
23  present here.
24          **THE COURT:**  Well, even if there's no explicit
25  severance provision by agreement, the Court -- there are a set

of rules that govern when you can sever, when it's appropriate, and when the entire agreement is so infected that you can't and the wording, et cetera --

**MR. BROME:** Exactly.

**THE COURT:** -- can't be righted and all that.

**MR. BROME:** Yes.

**THE COURT:** Okay. I understand your point.

Fees and costs. So it looks like there's a limit, I guess. Right? An employee can pay up to $400 under the JAMS policy?

**MR. SCHWARTZ:** That's exactly right, Judge. JAMS has minimum due process standards that are designed to address exactly this argument.

Every employment case referred to JAMS is subject to those standards pursuant to JAMS' rules. The employee cannot be required to pay more than the filing fee in the United States District Court, which, by the way, Your Honor, is less than the filing fee in a California state court for a similarly situated plaintiff. The plaintiff also has the right to apply, just as he or she would in this court, for an *in forma pauperis* waiver.

So the JAMS agreements are subject to that provision, which completely takes the fee issue off the table.

The fee provision also is severable, even if that rule did not apply, under cases like *Lang*, *Castaldi*, and *Laughlin*, which we've cited in the brief, but you don't even need to get there.

**THE COURT:** The 400 is designed to sort of replicate or no greater than what would have to be paid in state or federal court?

**MR. SCHWARTZ:** In this court, Your Honor. And, in fact, it is less than what you would pay in a California state court.

**MR. BROME:** We disagree with that.

The JAMS employment due process protections are not automatically triggered, and they are not provided for in this agreement. In fact, this agreement provides -- this offer letter provides for the JAMS Comprehensive Arbitration Rules and Procedures which are distinct from the employment rules and from the employment protocols.

**THE COURT:** Does it encompass, or it's completely separate from the employment?

**MR. BROME:** It's a distinct set of rules.

**THE COURT:** By preclusion, then, you think it implicitly, therefore, excludes the employment?

**MR. BROME:** Where the agreement provides for a certain set of rules, in our experience, JAMS will apply that set of rules unless there is a fairly strong showing that they cannot apply and that a different set of rules must apply.

And there are certainly instances where a plaintiff asserting claims that he or she believes to be employment claims is not protected by those due process protocols.

Independent contractor provisions are one such example.

But the Court has to look at the agreement as its written and not rely on JAMS to protect employee due process rights. And the employment offer letter contains a set of rules that do not encompass those protections and, in fact, have much less favorable terms for an employee.

The *Armendariz* decision is fairly clear that an agreement by the employer after the fact to agree to concessions that would render a policy enforceable is not sufficient to cure a deficient arbitration policy; and those -- the incorporation of that set of rules is a substantive unconscionability problem that I don't believe the Court can cure by suggesting that, well, JAMS should apply a different set of rules.

**MR. SCHWARTZ:** And, Your Honor --

**THE COURT:** So what about that?

**MR. SCHWARTZ:** Yeah. The only cases in which it is unclear as to whether JAMS will apply those minimum standards are the example that counsel offered where there is a dispute about whether the relationship is one of employee and employer or independent contractor.

That is not an issue here. Everyone agrees that these claims arise from an employment relationship, going back to Your Honor's first point about the scope of the arbitration provision. JAMS' minimum due process standards for employment claims apply to every employment claim. It is not

1  discretionary.
2      **THE COURT:**  How do we know that?  Do the Comprehensive
3  Rules of JAMS make some reference or incorporation of that?
4  How do we know that the due process provisions apply?
5      **MR. SCHWARTZ:**  I'll have to check that, Your Honor.
6  The minimum due process standards, we've cited in the brief;
7  page 14, for example, in the reply brief.  And those standards,
8  on their face, make clear that they apply to every employment
9  claim filed with JAMS, regardless of the choice of the
10 procedural rules.
11     **THE COURT:**  So the internal operation rules of JAMS
12 say they apply to this --
13     **MR. SCHWARTZ:**  That's correct, Your Honor.  And this
14 is what is published to all parties by JAMS, on JAMS' website.
15     **THE COURT:**  What do we do with a contract provision
16 that just says "shall be resolved by final and binding
17 arbitration under the Judicial Arbitration and Mediation
18 Services Comprehensive Arbitration Rules and Procedures"?  It
19 almost sounds like if they don't include the minimum due
20 process rules, it almost sounds like under those rules, and
21 only those rules, and not anything else.
22     **MR. SCHWARTZ:**  I think what you do with that is, the
23 agreement refers the arbitration to JAMS.  We know from JAMS'
24 published rules that any employment dispute sent to them,
25 regardless of the choice of procedure, whether comprehensive

1  procedure or employment procedure, is subject to the minimum
2  due process standards.  JAMS has published that.
3       So I think you can assume that the parties have
4  incorporated that by reference or, at worst, that this
5  agreement is silent as to fees.  There's nowhere here where it
6  says anything more than $400 is going to be imposed on the
7  employee.  And against that background, we know that JAMS won't
8  impose more than $400.  That has been and remains their formal
9  policy published to the world.
10          **MR. BROME:**  The Comprehensive Rules are pretty
11 explicit that each party must pay its pro rata share of JAMS'
12 fees.  And if the plaintiff were to file in JAMS, JAMS sees
13 this as the arbitration policy.  This arbitration policy sets
14 forth certain rules.  Those rules obligate the plaintiff to pay
15 certain fees before this even gets to an arbitrator to
16 determine whether the due process protections apply.  JAMS may
17 administratively close the case if plaintiff does not pay his
18 or her pro rata share of the fees.
19          **THE COURT:**  Is there any authority that has looked at
20 this precise question of whether wording such as this is broad
21 enough to sort of bring in and incorporate the JAMS due process
22 rules, any court that has looked at that?
23          **MR. SCHWARTZ:**  I'll have to check that for you,
24 Your Honor.
25       I do know, and we've cited at Footnote 4 of our brief,

1  that several courts in this district have severed cost-sharing
2  provisions that they found to be inequitable.  So at worst,
3  the Court certainly has authority to do that.  But I don't
4  think you need to get there because the reference to JAMS
5  necessarily incorporates JAMS' minimum due process standards
6  for employment claims.
7      Again, the only cases -- and I know exactly what counsel
8  is referring to.  The only cases where there's any ambiguity
9  about that are cases where there is a dispute as to the nature
10 of the relationship, whether it is an employer-employee
11 relationship or not.  There's no dispute here that these
12 plaintiffs were employed by Quantcast.
13         **THE COURT:**  So what about severance?  If I were to
14 find that somehow the due process $400 cannot be fairly
15 implied, what's your view about severance of this particular
16 provision?
17         **MR. BROME:**  Sure.  Before I address severance, the
18 *Lou vs. Ma Labs* decision that we cited in the brief did
19 specifically address the JAMS Comprehensive Rules.
20         **THE COURT:**  Which case again?
21         **MR. BROME:**  *Lou vs. Ma Labs*.
22         **THE COURT:**  Oh, yeah.
23         **MR. BROME:**  That addressed attorneys' fees as well,
24 but it also specifically referred to the JAMS Comprehensive
25 Rules.

1      **MR. SCHWARTZ:**  I apologize for interrupting.

2      Just to address *Lou*, that case specifically included a

3  provision that allowed the employer to be awarded its

4  attorneys' fees, including the hourly value of the services of

5  the in-house general counsel.  So I think that's quite

6  different from what we've got here.

7      **THE COURT:**  All right.  Go on.

8      **MR. BROME:**  Your Honor, I think the severance for the

9  rules is a problem, and the severance for the non-mutual

10  provisions is a problem.

11      In *Armendariz*, it specifically talked about non-mutual

12  provisions permeating arbitration agreements, which I think is

13  what we have here.  We have an employment offer letter that

14  attempts to bind the employee to arbitrate without imposing any

15  such obligation on the employer.  And that is the sort of

16  inherently one-sided agreement where that provision cannot be

17  severed.  And the unfair rules that impose excessive costs on a

18  plaintiff, likewise, cannot be severed.

19      If you take out the agreement to arbitrate under a certain

20  set of rules and you strike that, this Court would have to

21  impose a new set of rules, which is beyond the scope of what a

22  court can do.

23      Likewise, that set of rules conflicts with --

24      **THE COURT:**  Well, is that true?  If there's no

25  reference in an arbitration agreement to incorporating AAA or

1   JAMS, I can't believe that that wouldn't still be enforceable.
2              **MR. SCHWARTZ:**  You're correct, Your Honor.  You have
3   authority under Section 5 of the Federal Arbitration Act to
4   appoint an arbitrator under the authority of the Court.  So
5   that's not accurate.
6              **THE COURT:**  Yeah.  So I'm not sure I agree that the
7   failure to specify one or the other organizations, which is so
8   common these days, because there was a time when they didn't
9   exist or arbitration agreements didn't have such preferences.
10  We'd have to go back a few decades but...
11       But your argument is this is so infused with unilateral
12  power because of the "you" and not the "we" argument.
13             **MR. BROME:**  Correct.  On that point, one of the cases
14  cited by defendant in reply was quite clearly different.
15       In the *Little versus Auto Stiegler* case, while the
16  language said, you know, "I understand" for who understands the
17  terms of the agreement, who was bound was clearly different.
18  It says, "Both I and the company give up our rights."
19       That term has to be implied here.  And so it's severing a
20  term that is not even in the agreement and has to be sort of
21  implied and written in.  It is different to write in a term to
22  make a contract mutual as opposed to severing a specific term.
23             **THE COURT:**  Well, what about the *Roman* case, though?
24  I mean, it took the words "I agree that in the event I am
25  hired, that all disputes arising out of my employment will be

1   submitted to arbitration."
2        The Court says (reading):
3            "We simply do not believe that the mere inclusion of
4        the words 'I agree' by one party in an otherwise mutual
5        arbitration provision destroys the bilateral nature."
6        And so your argument about the carve-out and the employer
7   gets the -- it does suggest that this was intended to apply.
8   You wouldn't need a carve-out if it didn't apply at all.
9        So I'm not sure this case is that distinguishable in that
10  regard.
11       **MR. BROME:** I think that what's distinguishable is
12  that there is nothing apparent from the text of this letter
13  that suggests it is a mutual agreement. Everything indicating
14  mutuality has to be read in. The fact that it says "any and
15  all disputes or controversies," you still have to read in "that
16  either party may assert."
17       And so the fact that the carve-out is relevant once that
18  is read in, it's just that there's a boots and sus- -- a belt
19  and suspenders approach to make this an agreement that binds
20  the employee, but not the employer.
21       **THE COURT:** But when it accepts those disputes which
22  may arise from your confidentiality agreement, that's an
23  agreement that the employee signs that says, "I will keep trade
24  secrets," et cetera. So obviously, that's for the benefit of
25  the employer.

1     **MR. BROME:** Correct.

2     **THE COURT:** And so this seems to suggest that this
3 would apply. This was intended to except from that breaches of
4 the confidentiality agreement. So it does imply that there's
5 an employer enforcement side underlying all this. It's
6 assumed.

7     **MR. BROME:** That's certainly one reasonable reading
8 of it, that that obligation on the employer is assumed.

9     Once it is assumed, then that carve-out applies and
10 protects the employer by virtue of the reference to the
11 confidentiality agreement.

12     **THE COURT:** All right. Well, I will take a close look
13 at -- this has been helpful, and what you've highlighted for me
14 has been helpful today. So I will take it under submission and
15 get out a ruling as quickly as I can.

16     **MR. SCHWARTZ:** Thank you, Your Honor.

17     **MR. BROME:** Thank you, Your Honor.

18     **THE COURT:** Appreciate it. Thank you.

19     **THE CLERK:** Court is in recess.

20         (Proceedings adjourned at 2:05 p.m.)

21                    ---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Tuesday, December 10, 2019

*Ana M. Dub*
_____

Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
Official Reporter, U.S. District Court